IN THE UNITED STATES DISTRICT COURT FILED

U.S. DISTRICT COURT

FOR THE DISTRICT OF WYOMING DISTRICT OF WYOMING

2015 SEP 30 AM 10 08

STEPHAN HARRIS, CLERK
CASPER

| | | |
|---|---|---|
| STATE OF WYOMING, STATE OF COLORADO, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| STATE OF NORTH DAKOTA, STATE OF UTAH, | ) | |
| and UTE INDIAN TRIBE, | ) | |
| | ) | |
| Intervenor-Petitioners, | ) | |
| | ) | |
| vs. | ) | Case No. 2:15-CV-043-SWS |
| | ) | **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE | ) | |
| INTERIOR; SALLY JEWELL, in her official | ) | |
| capacity as Secretary of the Interior; UNITED | ) | |
| STATES BUREAU OF LAND MANAGEMENT; | ) | **ORDER ON MOTIONS FOR** |
| and NEIL KORNZE, in his official capacity as | ) | **PRELIMINARY INJUNCTION** |
| Director of the Bureau of Land Management, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| SIERRA CLUB, EARTHWORKS, WESTERN | ) | |
| RESOURCE ADVOCATES,    CONSERVATION | ) | |
| COLOARDO EDUCATION FUND, THE | ) | |
| WILDERNESS SOCIETY, and SOUTHERN | ) | |
| UTAH WILDERNESS ALLIANCE, | ) | |
| | ) | |
| Intervenor-Respondents. | ) | |

| | | |
|---|---|---|
| INDEPENDENT PETROLEUM | ) | |
| ASSOCIATION OF AMERICA, and | ) | |
| WESTERN ENERGY ALLIANCE, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| vs. | ) | Case No. 2:15-CV-041-SWS |
| | ) | |
| SALLY JEWELL, in her official capacity as | ) | |
| Secretary of the United States Department of the | ) | |
| Interior; and BUREAU OF LAND | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| Respondents. | ) | |

This matter comes before the Court on the motions for preliminary injunction filed by the various Petitioners and Intervenor-Petitioners: *Motion for Preliminary Injunction* of Petitioners Independent Petroleum Association of America ("IPAA") and Western Energy Alliance ("Alliance") (hereinafter "Industry Petitioners") (ECF No. 11 in 15-CV-041); *Wyoming and Colorado's Motion for Preliminary Injunction* (ECF No. 32),[1] in which the State of Utah has joined; *North Dakota's Motion for Preliminary Injunction* (ECF No. 52), in which the State of Utah has joined; and *Motion for Preliminary Injunction* filed by the Ute Indian Tribe (ECF No. 89). The Court, having considered the briefs and materials submitted in support of the motions and the oppositions thereto, including the Administrative Record, having heard witness testimony and oral argument of counsel, and being otherwise fully advised, FINDS and ORDERS as follows:

## BACKGROUND

On March 26, 2015, the Bureau of Land Management ("BLM") issued the final version of its regulations applying to hydraulic fracturing on federal and Indian lands. 80 Fed. Reg. 16,128-16,222 (Mar. 26, 2015) ("Fracking Rule"). The Fracking Rule's focus is on three aspects of oil and gas development – wellbore construction, chemical disclosures, and water management (*id.* at 16,128 & 16,129) – each of which is subject to comprehensive regulations under existing federal and state law. The rule was scheduled to take effect on June 24, 2015. Following a hearing on the preliminary injunction motions, this Court postponed the effective date of the Fracking Rule pending the BLM's

---

[1] Unless otherwise noted, all filings referenced herein are from the docket in Case No. 15-CV-043, which has been designated the Lead Case in these consolidated cases. (*See* ECF No. 44.)

lodging of the Administrative Record ("A.R.") and the Court's ultimate ruling on the preliminary injunction motions. (*See* ECF No. 97.)

For the better part of the last decade, oil and natural gas production from domestic wells has increased steadily. Most of this increased production has come through the application of the well stimulation technique known as hydraulic fracturing (or "fracking") – the procedure by which oil and gas producers inject water, sand, and certain chemicals into tight-rock formations (typically shale) to create fissures in the rock and allow oil and gas to escape for collection in a well.[2] *See* 80 Fed. Reg. at 16,131 (estimating that ninety percent of new wells drilled on federal lands in 2013 were stimulated using hydraulic fracturing techniques). Hydraulic fracturing has been used to stimulate wells in the United States for at least 60 years – traditionally in conventional limestone and sandstone reservoirs – and meaningful attempts to use the technique to extract hydrocarbons from shale date back to at least the 1970s. *See* U.S. DEP'T OF ENERGY, *How is Shale Gas Produced?*[3] "More recently, hydraulic fracturing has been coupled with relatively new horizontal drilling technology in larger-scale operations that have allowed greatly increased access to shale oil and gas resources across the country, sometimes in areas that have not previously or recently experienced significant oil and gas development." 80 Fed. Reg. 16,128.

Purportedly in response to "public concern about whether fracturing can lead to or cause the contamination of underground water sources," and "increased calls for stronger

---

[2] The water and sand together typically make up 98 to 99 percent of the materials pumped into a well during a fracturing operation. 80 Fed. Reg. at 16,131.

[3] Available at http://energy.gov/sites/prod/files/2013/04/f0/how_is_shale_gas_produced.pdf.

regulation and safety protocols," the BLM undertook rulemaking to implement "additional regulatory effort and oversight" of this practice. *Id.* at 16,128 & 16,131. In May of 2012, the BLM issued proposed rules "to regulate hydraulic fracturing on public land and Indian land." 77 Fed. Reg. 27,691 (May 11, 2012). The stated focus of the rules was to: (i) provide disclosure to the public of chemicals used in hydraulic fracturing; (ii) strengthen regulations related to well-bore integrity; and (iii) address issues related to water produced during oil and gas operations. *Id.* The BLM reports it received approximately 177,000 public comments on the initial proposed rules "from individuals, Federal and state governments and agencies, interest groups, and industry representatives." 80 Fed. Reg. at 16,131.

Just over a year later, the BLM issued revised proposed rules, representing that the agency has "used the comments on [the May 11, 2012 draft proposed rules] to make improvements" to the agency's proposal. 78 Fed. Reg. 31,636 (May 24, 2013). Key changes included an expanded set of cement evaluation tools to help ensure protection and isolation of usable water zones and a revised process for how operators could report information about chemicals they claim to be protected as trade secrets. *Id.* at 31,636 & 31,637. The BLM also expressed its intent to "work with States and tribes to establish formal agreements that will leverage the strengths of partnerships, and reduce duplication of efforts for agencies and operators, particularly in implementing the revised proposed rule as consistently as possible with State or tribal regulations." *Id.* at 31,637. The BLM reportedly received over 1.35 million comments on the supplemental proposed rule. 80 Fed. Reg. at 16,131.

4

The BLM ultimately published its final rule regulating hydraulic fracturing on federal and Indian lands on March 26, 2015. The BLM determined the Fracking Rule fulfills the goals of the initial proposed rules: "[t]o ensure that wells are properly constructed to protect water supplies, to make certain that the fluids that flow back to the surface as a result of hydraulic fracturing operations are managed in an environmentally responsible way, and to provide public disclosure of the chemicals used in hydraulic fracturing fluids." *Id.* at 16,128.

The Industry Petitioners and the States of Wyoming and Colorado filed separate *Petitions for Review of Final Agency Action* on March 20th and 26th, 2015, respectively, seeking judicial review of the Fracking Rule pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. The States of North Dakota and Utah, and the Ute Indian Tribe of the Uintah and Ouray Reservation, later intervened in the States' action, and the Court granted the parties' motion to consolidate the two separate actions. Petitioners and Intervenor-Petitioners request a preliminary injunction enjoining the BLM from applying the Fracking Rule pending the resolution of this litigation.

## STANDARD OF REVIEW

To obtain a preliminary injunction, petitioners must show: "(1) a likelihood of success on the merits; (2) that they will [likely] suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest." *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). *See also Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[B]ecause a preliminary injunction is an extraordinary remedy, the

movant's right to relief must be clear and unequivocal." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (internal quotation marks and citation omitted).

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted). *See also Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (primary goal of preliminary injunction is to preserve the pre-trial status quo). The grant or denial of a preliminary injunction lies within the sound discretion of the district court. *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir. 1984).

## DISCUSSION

Petitioners contend the Fracking Rule should be set aside because it is arbitrary, not in accordance with law, and in excess of the BLM's statutory jurisdiction and authority. *See* 5 U.S.C. § 706(2)(A) & (C).[4] The Ute Indian Tribe additionally contends the Fracking Rule is contrary to the Federal trust obligation to Indian tribes.

---

[4] The APA's scope of review provisions relevant here are:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

## A.  *Likelihood of Success on the Merits*

Judicial review of agency action is governed by the standards set forth in § 706 of the APA, requiring the reviewing court to engage in a "substantial inquiry." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).  While an agency's decision is entitled to a "presumption of regularity," the presumption does not shield the agency from a "thorough, probing, in-depth review." *Id.* at 1574.  "[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Id.* "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id.*

Under the arbitrary and capricious standard, a court must ascertain "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.*  The agency must provide a reasoned basis for its

---

* * *
(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    * * *
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    * * *
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

5 U.S.C. § 706.

action and the action must be supported by the facts in the record. *Id.* at 1575. Agency

action is arbitrary if not supported by "substantial evidence" in the administrative record.

*Olenhouse*, 42 F.3d at 1575; *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d

1147, 1156 (10th Cir. 2004). "Substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Pennaco Energy*,

377 F.3d at 1156 (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)).

"Because the arbitrary and capricious standard focuses on the rationality of an agency's

decisionmaking process rather than on the rationality of the actual decision, '[i]t is well-

established that an agency's action must be upheld, if at all, on the basis articulated by the

agency itself.'" *Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983)). Courts will not accept post-hoc

rationalizations for agency action. *Biodiversity Conservation Alliance v. Jiron*, 762 F.3d

1036, 1060 (10th Cir. 2014). "The agency itself must supply the evidence of that

reasoned decisionmaking in the statement of basis and purpose mandated by the APA."

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. United States*,

735 F.2d 1525, 1531 (D.C. Cir. 1984). *See also Wyo. Outdoor Council v. U.S. Forest*

*Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) (rule's preamble serves as a source of evidence

concerning contemporaneous agency intent).

    1.    <u>Whether BLM Has Authority to Regulate Hydraulic Fracturing</u>

    "It is axiomatic that an administrative agency's power to promulgate legislative

regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown*

*Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Regardless of how serious the problem an

administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). Accordingly, an "essential function" of a court's review under the APA is to determine "whether an agency acted within the scope of its authority." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015).

Where a case involves an administrative agency's assertion of authority to regulate a particular activity pursuant to a statute that it administers, the court's analysis is governed by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Brown & Williamson*, 529 U.S. at 132.

> Under *Chevron*, a reviewing court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress. But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated[.]

*Id.* (internal quotation marks and citations omitted). This Court must first determine, then, whether Congress has directly addressed the issue of BLM's authority to regulate hydraulic fracturing.

The Supreme Court has provided the following guidance for determining whether Congress has specifically addressed the question at issue:

9

In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. *See Brown v. Gardner*, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context"). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389, 79 S. Ct. 818, 3 L. Ed. 2d 893 (1959). Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand. *See United States v. Estate of Romani*, 523 U.S. 517, 530–531, 118 S. Ct. 1478, 140 L. Ed. 2d 710 (1998); *United States v. Fausto*, 484 U.S. 439, 453, 108 S. Ct. 668, 98 L. Ed. 2d 830 (1988). In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency. Cf. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994).

*Id.* at 132-33. Guided by the foregoing principles, the Court finds that Congress has directly spoken to the issue and precluded federal agency authority to regulate hydraulic fracturing not involving the use of diesel fuels.

Despite having previously disavowed authority to regulate hydraulic fracturing,[5] the BLM now asserts authority to promulgate the Fracking Rule under various statutes: the Federal Land Policy and Management Act of 1976 ("FLPMA"),[6] 43 U.S.C. §§ 1701-

---

[5] *See Center for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013) (holding BLM's failure to consider environmental impact of fracking on leased lands violated "hard look" obligations under the National Environmental Policy Act ("NEPA"); but lease sales did not violate the MLA).

[6] FLPMA was not initially asserted as a basis for BLM's authority to promulgate the Fracking Rule; FLPMA was added to the authorities section in the supplemental rules issued in May of 2013. 78 Fed. Reg. at 31,646.

1787; the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. §§ 181-287; the 1930 Right-of-Way Leasing Act, *id.* §§ 301-306; the Mineral Leasing Act for Acquired Lands, *id.* §§ 351-360; the Federal Oil and Gas Royalty Management Act of 1982, *id.* §§ 1701-1759; the Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a-396g; and the Indian Mineral Development Act of 1982 ("IMDA"), *id.* §§ 2101-2108. 80 Fed. Reg. at 16,217. The State Petitioners and Ute Indian Tribe argue none of these statutes authorize the BLM to regulate hydraulic fracturing activities.

The MLA creates a program for leasing mineral deposits on federal lands.[7] Congress authorized the Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to *carry out and accomplish the purposes* of the [the MLA]." 30 U.S.C. § 189 (emphasis added). "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967)). *See also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) ("broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas"). Specifically for oil and gas leasing, the MLA, *inter alia,* establishes terms of the lease and royalty and rental amounts (30 U.S.C. §§ 223, 226(d)&(e)), requires the lessee to

---

[7] The MLA applies to deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, or gas, and virtually all lands containing such deposits owned by the United States. 30 U.S.C. § 181.

"use all reasonable precautions to prevent waste of oil or gas developed in the land" (*id.* § 225), authorizes the Secretary of Interior to lease all public lands subject to the Act for oil and gas development (*id.* § 226(a)),[8] directs the Secretary to regulate *surface*-disturbing activities (*id.* § 226(g)), and allows for the establishment of cooperative development plans to conserve oil and gas resources (*id.* § 226(m)).

In the Right-of Way Leasing Act, Congress expanded the Secretary's leasing authority to allow leasing of federally owned minerals beneath railroads and other rights of way. 30 U.S.C. § 301. Like the MLA, the Right-of-Way Leasing Act grants the Secretary general rulemaking authority to carry out the Act. *Id.* § 306. The Mineral Leasing Act for Acquired Lands again extended the provisions of the MLA, including the Secretary's leasing authority, to apply to minerals beneath lands coming into federal ownership and not already subject to the MLA. 30 U.S.C. §§ 351-52. Although, like the MLA, the Act grants the Secretary rulemaking authority to carry out the purposes of the Act, *id.* § 359, the Act simply expanded the BLM's authority to issue and manage leases for the development of specified minerals, including oil and gas. *See Watt v. Alaska*, 451 U.S. 259, 269 (1981). The Fracking Rule's authority section also cites the general rulemaking authority granted by the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"). 30 U.S.C. § 1751. FOGRMA, however, simply creates a thorough system for collecting and accounting for federal mineral royalties. *See Shell Oil Co. v. Babbitt*, 125 F.3d 172, 174 (3rd Cir. 1997). The general rulemaking authority granted by

---

[8] The MLA expressly excepts wilderness lands from oil and gas leasing. 30 U.S.C. § 226-3.

these ancillary mineral leasing statutes, which is cabined by the purposes of the Acts, cannot be interpreted as authority for comprehensive regulation of hydraulic fracturing.

The Secretary also invokes the statutory authority granted to the BLM by the Indian Mineral Leasing Act and the Indian Mineral Development Act as a basis for the Fracking Rule.[9] These statutes, generally, grant the Secretary broad regulatory jurisdiction over oil and gas development and operations on Indian lands. 25 U.S.C. §§ 396d, 2107. However, neither the IMLA nor the IMDA delegates any more specific authority over oil and gas drilling operations than the MLA, nor has BLM promulgated separate regulations for operations on Indian lands. Rather, existing Bureau of Indian Affairs ("BIA") regulations incorporate 43 C.F.R. Part 3160 (Onshore Oil and Gas Operations – General) and require BLM to oversee implementation of those regulations. 25 C.F.R. §§ 211.4, 225.4. The Fracking Rule amends and revises the Part 3160 regulations. *See* 80 Fed. Reg. at 16,217.

BLM claims the Fracking Rule simply supplements existing requirements for oil and gas operations set out in 43 C.F.R. 3162.3-1 and Onshore Oil and Gas Orders 1, 2 and 7. 80 Fed. Reg. at 16,129. BLM asserts its decades-old "cradle-to-grave" regulations governing oil and gas operations, promulgated pursuant to its MLA § 189 authority, already include regulation of hydraulic fracturing, albeit minimally "because the practice was not extensive (or similar to present-day design) when the regulations were promulgated." (*Resp't Br. in Opp'n to Wyoming and Colorado's Mot. for Prelim.*

---

[9] "The IMLA aims to provide Indian tribes with a profitable source of revenue and to foster tribal self-determination by giving Indians a greater say in the use and disposition of the resources on their lands." *United States v. Navajo Nation*, 537 U.S. 488 (2003).

*Inj.* at 11) (ECF No. 68). Historically, however, BLM's only regulation addressing hydraulic fracturing worked to prevent any additional surface disturbance and impose reporting requirements and did not regulate the fracturing process itself.[10] *See* 43 C.F.R. § 3162.3-2(b) ("Unless additional surface disturbance is involved . . . prior approval is not required for routine fracturing or acidizing jobs . . . ; however, a subsequent report on these operations must be filed . . . ."). This requirement makes sense because the MLA expressly authorizes regulation of "all *surface*-disturbing activities . . . in the interest of conservation of *surface* resources." 30 U.S.C. § 226(g) (emphasis added). The BLM cites to no other existing regulation addressing hydraulic fracturing. Neither does the BLM cite any specific provision of the mineral leasing statutes authorizing regulation of this underground activity or regulation for the purpose of guarding against any incidental, underground environmental effects. Indeed, the BLM has previously taken the position, up until formulation of the Fracking Rule, that it lacked the authority or jurisdiction to regulate hydraulic fracturing. *See Center for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1156 (N.D. Cal. 2013).

> When an agency claims to discover in a long-extant statute an unheralded power to regulate "a significant portion of the American economy," [the Court] typically greet[s] its announcement with a measure of skepticism. [The Court] expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance."

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) (quoting *Brown & Williamson*, 529 U.S. at 159, 160).

---

[10] In its opposition brief to the Industry Petitioners' preliminary injunction motion, the Government admits, "Existing BLM regulations included some limited provisions that mentioned, but did not attempt to regulate hydraulic fracturing, [] which is now typically coupled with directional and horizontal drilling that can extend for miles from the drill site." (*Resp't Br. in Opp'n to Pet'rs' Mot. for Prelim. Inj.* at 27) (ECF No. 20 in 15-CV-041).

In 1976, Congress enacted the Federal Land Policy and Management Act to provide "a comprehensive statement of congressional policies concerning the management of the public lands" owned by the United States and administered by the BLM. *Rocky Mtn. Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 737 (10th Cir. 1982). As with the MLA, Congress authorized the Secretary of the Interior to "promulgate rules and regulations *to carry out the purposes of this Act* and of other laws applicable to the public lands[.]" 43 U.S.C. § 1740 (emphasis added). FLPMA charges the BLM with managing public lands on the basis of "multiple use and sustained yield" of their various resources – that is, utilizing the resources "in the combination that will best meet the present and future needs of the American people . . . [taking] into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values[,]" and "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id*. §§ 1701(a)(7), 1702(c) & (h).

"'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put[.]" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). The public lands are to be managed in a manner "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values," while at the same time recognize "the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands[.]" 43 U.S.C. §

15

1701(a)(8) & (12). FLPMA "represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves." *Rocky Mtn. Oil and Gas Ass'n*, 696 F.2d at 738. In pursuit of this general purpose, Congress authorized the BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands" and to promulgate regulations necessary to achieve FLPMA's goals. 43 U.S.C. §§ 1732(b), 1733(a), and 1740.

Although the Secretary asserts FLPMA delegates to BLM broad authority and discretion to manage and regulate activities on public lands, the BLM has not heretofore asserted FLPMA as providing it with authority to regulate oil and gas drilling operations pursuant to 43 C.F.R. Part 3160.[11] Nothing in FLPMA provides BLM with specific authority to regulate hydraulic fracturing or underground injections of any kind; rather, FLPMA primarily establishes congressional policy that the Secretary manage the public lands under principles of multiple use and sustained yield. At its core, FLPMA is a land use planning statute. *See* 43 U.S.C. § 1712; *Rocky Mtn. Oil and Gas Ass'n*, 696 F.2d at 739 ("FLPMA contains comprehensive inventorying and land use planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved"); *S. Utah Wilderness Alliance*, 542 U.S. at 57 (FLPMA establishes a dual regime of inventory and planning); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (FLPMA establishes requirements for land use planning on public land). In the

---

[11] *See* 43 C.F.R. § 3160.0-3 (1983); *Onshore Oil and Gas Order No. 2, Drilling Operations*, 53 Fed. Reg. 46798-01, at 46804 (1988). Although Onshore Order No. 7 governing disposal of produced water cites to FLPMA's enforcement provision, 43 U.S.C. § 1733, it did not amend the text of Part 3160's authority section to include reference to FLPMA or cite to FLPMA's general rule-making authority in § 1740. 58 Fed. Reg 47354-01, at 47361 (1993).

context of oil and gas operations, FLPMA generally comes into play "[a]t the earliest and broadest level of decision-making" when a land use plan is developed identifying allowable uses for a particular area. *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). If oil and gas development is allowed, BLM first determines whether the issuance of a particular oil and gas lease conforms to the land-use plan. *Id.* (citing 43 C.F.R. § 1610.5-3(a)). The lessee must then obtain BLM approval of an Application for Permit to Drill ("APD") before commencing any "drilling operations" or "surface disturbance preliminary thereto" and comply with other provisions of Part 3160.[12] *See id.*; 43 C.F.R. 3162.3-1(c).

In the meantime, and prior to the enactment of FLPMA, Congress had enacted the Safe Drinking Water Act ("SDWA"). Pub. L. No. 93-523, 88 Stat. 1660 (1974) (codified as amended at 42 U.S.C. §§ 300f through 300j-26). Part C of the SDWA establishes a regulatory program specifically for the protection of underground sources of drinking water. 42 U.S.C. §§ 300h through 300h-8. This program requires the Environmental Protection Agency ("EPA") to promulgate regulations that set forth minimum requirements for effective State underground injection control ("UIC") programs "to prevent underground injection which endangers drinking water sources."[13] *Id.* §

---

[12] BLM's administration of oil and gas leases on federal land is also subject to the National Environmental Policy Act ("NEPA"), "which requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038, 1042 (10th Cir. 2011) (internal quotation marks and citation omitted). Thus, oil and gas APD's not otherwise exempted must undergo the NEPA environmental review process. *See Western Energy Alliance v. Salazar*, No. 10-CV-237-F, 2011 WL 3738240, at *3 (D. Wyo. Aug. 12, 2011) (unpublished). Regulation of the lease and APD process is outlined in 43 C.F.R. § 3101.1-2, which defines what reasonable measures BLM can require.

[13] "A state must submit to the EPA a proposed UIC program that meets these minimum requirements, and receive EPA approval, in order to obtain primary regulatory and enforcement responsibility for underground injection activities within that state. § 300h–1. The state retains primary responsibility until EPA determines, by rule, that

300h(b)(1). Part C prohibits "any underground injection" without a permit and mandates that a UIC program include "inspection, monitoring, recordkeeping, and reporting requirements[.]" *Id.* § 300h(b)(1)(A) & (C). The SDWA defined "underground injection" as "the subsurface emplacement of fluids by well injection." *Id.* § 300h(d)(1). *See Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1470 (11th Cir. 1997) ("*LEAF*").

For two decades after the enactment of the SDWA, the EPA took the position that hydraulic fracturing was not subject to the UIC program because that technique for enhancing the recovery of natural gas from underground formations did not, by its interpretation, fall within the *regulatory* definition of "underground injection." *See LEAF*, 118 F.3d at 1471. Responding to a challenge of Alabama's UIC program because it did not regulate hydraulic fracturing activities, the EPA stated it interpreted the definition of "underground injection" as encompassing only those wells whose "principal function" is the underground emplacement of fluids. The EPA had determined that the principal function of gas production wells which are also used for hydraulic fracturing is gas production, not the underground emplacement of fluids. *Id.* The Eleventh Circuit Court of Appeals rejected the EPA's position. Applying the first step in the *Chevron* framework, the *LEAF* court concluded the unambiguous language of the statute made clear that Congress intended for the EPA to regulate *all* underground injection under the UIC programs, and the process of hydraulic fracturing obviously fell within the plain

<hr>

the state UIC program no longer meets the minimum requirements established under the SDWA. § 300h–1(b)(3)." *Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1469-70 (11th Cir. 1997). The SDWA also contains provisions allowing an Indian Tribe to assume primary enforcement responsibility for UIC. § 300h-1(e).

meaning of the *statutory* definition of "underground injection." *Id.* at 1474-75. Thus, pursuant to the SDWA's cooperative federalism system for regulating underground injection, including hydraulic fracturing, the States and Indian Tribes could assume primary enforcement responsibility for UIC programs, subject to EPA approval and oversight. *See* 42 U.S.C. § 300h-1(b), (c) & (e).

Such was the state of the law when Congress enacted the Energy Policy Act of 2005 ("EPAct"), a comprehensive energy bill addressing a wide range of domestic energy resources, with the purpose of ensuring jobs for the future "with secure, affordable, and reliable energy." Pub. L. No. 109-58, 119 Stat. 594 (2005). The EPAct was intended, at least in part, to expedite oil and gas development within the United States. *See Western Energy Alliance v. Salazar*, No. 10-CV-237-F, 2011 WL 3738240, at *2 (D. Wyo. Aug. 12, 2011) (unpublished). Recognizing the EPA's authority to regulate hydraulic fracturing under the SDWA, the EPAct included an amendment to the SDWA, expressly and unambiguously revising the definition of "underground injection" to *exclude* "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities." EPAct Sec. 322 (codified at 42 U.S.C. § 300h(d)(1)(B)(ii)). There can be no question that Congress intended to remove hydraulic fracturing operations (not involving diesel fuels) from EPA regulation under the SDWA's UIC program.

The issue presented here is whether the EPAct's explicit removal of the EPA's regulatory authority over non-diesel hydraulic fracturing likewise precludes the BLM from regulating that activity, thereby removing fracking from the realm of federal

regulation.[14]  Although the BLM does not claim authority for its Fracking Rule under the SDWA, a statute administered by the EPA, it defies common sense to interpret the more general authority granted by the MLA and FLPMA as providing the BLM authority to regulate fracking when Congress has directly spoken to the issue in the EPAct.  The SDWA specifically addresses protection of underground sources of drinking water through regulation of "underground injection," and Congressional intent as expressed in the EPAct indicates clearly that hydraulic fracturing is not subject to federal regulation unless it involves the use of diesel fuels.  "[T]he Executive Branch is not permitted to administer [an] Act in a manner that is inconsistent with the administrative structure that Congress enacted into law."  *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988).  If agency regulation is prohibited by a statute specifically directed at a particular activity, it cannot be reasonably concluded that Congress intended regulation of the same activity would be authorized under a more general statute administered by a different agency.[15]  "[I]t is a commonplace of statutory construction that the specific governs the general[.]" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  *See also In re Gledhill*, 76 F.3d 1070, 1078 (10th Cir. 1996) ("a court should not construe a general statute to eviscerate a statute of specific effect").

---

[14] *See* Hannah Wiseman, *Untested Waters:  The Rise of Hydraulic Fracturing in Oil and Gas Production and the Need to Revisit Regulation*, 20 Fordham Envtl. L. Rev. 115, 145 (2009) (EPAct "conclusively withdrew fracing (sic) from the realm of federal regulation," leaving any regulatory control to the states).

[15] "[A]gencies must operate within the bounds of reasonable interpretation." *Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015).  The BLM's "interpretation is also unreasonable because it would bring about a [] transformative expansion in [BLM's] regulatory authority without clear congressional authorization." *Utility Air Regulatory Group*, 134 S. Ct. at 2444.

In determining whether Congress has spoken directly to the BLM's authority to regulate hydraulic fracturing under the MLA or FLPMA, this Court cannot ignore the implication of Congress' fracking-specific legislation in the SDWA and EPAct.

> The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S., at 453, 108 S. Ct. 668. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand. As [the Supreme Court] recognized [] in *United States v. Estate of Romani*, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." 523 U.S., at 530-531, 118 S. Ct. 1478.

*Brown & Williamson*, 529 U.S. at 143. The BLM argues that because no provision in the SDWA or EPAct expressly prohibits regulation of underground injection under any other federal statute, those Acts do not displace its authority to regulate the activity under FLPMA and the MLA. However, a court "[does] not presume a delegation of power simply from the absence of an express withholding of power[.]" *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013).[16] At the time the EPAct was enacted, the BLM had not asserted authority to regulate the fracking process itself and a Circuit Court of Appeals had determined Congress intended the activity to be regulated by the EPA under the SDWA. "Congress does not regulate in a vacuum." *Passamaquoddy Tribe v. State of Me.*, 75 F.3d 784, 789 (1st Cir. 1996). "The chief objective of statutory interpretation is to give effect to the legislative will. To achieve

---

[16] *See also Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) ("Plainly, if we were to *presume* a delegation of power from the absence of an express withholding of such power, agencies would enjoy virtually limitless hegemony . . . .") (internal quotation marks and citation omitted); *Sierra Club v. EPA*, 311 F.3d 853, 861 (7th Cir. 2002) ("Courts will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.") (internal quotation marks and citation omitted).

this objective a court must take into account the tacit assumptions that underlie a legislative enactment, including not only general policies but also preexisting statutory provisions." *Id*. at 788-89.

The BLM further argues that interpreting the EPAct as precluding all federal regulation of hydraulic fracturing would leave a regulatory gap on federal and Indian lands where the relevant States or Tribes are not sufficiently regulating the activity under state or tribal law.[17] Even so, "no matter how important, conspicuous, and controversial the issue, . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Brown & Williamson*, 529 U.S. at 161. And even if the BLM's interpretation was entitled to any deference in these circumstances, *Chevron* "is not a wand by which courts can turn an unlawful frog into a legitimate prince." *Associated Gas Distrib. v. F.E.R.C.*, 824 F.2d 981, 1001 (D.C. Cir. 1987). It seems the BLM is attempting to do an end-run around the EPAct; however, regulation of an activity must be by Congressional authority, not administrative fiat. The Court finds the intent of Congress is clear, so that is the end of the matter; "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

2.     <u>Whether the Fracking Rule is Arbitrary, Capricious, an Abuse of Discretion or Otherwise Not in Accordance with Law</u>

Even if the BLM had the authority to promulgate the Fracking Rule, the Court is troubled by the paucity of evidentiary support for the Rule. Agency action must be the

---

[17] From FY 2010 to FY 2013, 99.3% of the total well completions on federal and Indian lands nationwide occurred in states with existing regulations governing hydraulic fracturing operations. 80 Fed. Reg. at 16,187. *See also* DOI PS 0066530-31; DOI PS 0178935-37.

product of "reasoned decisionmaking" and supported by facts in the record. *Olenhouse*, 42 F.3d at 1575; *see also Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015). In the absence of a "rational justification" for the agency's action, the "APA's arbitrary and capricious standard" requires that the action be set aside. *Shays v. Federal Election Comm'n*, 414 F.3d 76, 97 (D.C. Cir. 2005). The Fracking Rule's preamble references the "*potential impacts that [fracking] may have on water quality and water consumption*" as justification for federal regulation. 80 Fed. Reg. at 16,131 (emphasis added). While "public concern" and "potential impacts" certainly warrant further study and investigation, such speculation, in itself, cannot justify comprehensive rulemaking. There must be a rational connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The BLM has neither substantiated the existence of a problem this rule is meant to address, identified a gap in existing regulations the final rule will fill, nor described how the final rule will achieve its stated objectives. Rather, the Fracking Rule seems a remedy in search of harm.

The BLM asserts the Fracking Rule is necessary to address concerns raised by the increased technological complexity and expansion of hydraulic fracturing.[18] 80 Fed. Reg. 16,128. Specifically, the final rule raises the risk of groundwater contamination as a primary concern motivating many of its provisions. The rule references and discusses

---

[18] The BLM suggests that the "increased complexity" of fracking and "larger-scale operations" allowing significantly deeper wells covering a larger horizontal area than operations of the past, in itself, justifies this comprehensive regulation. *See* 80 Fed. Reg. 16,128. However, the BLM does not explain why this is necessarily so; rather, the agency simply links the advanced technology to increased production, which in turn has increased public awareness and calls for stronger regulation. Such reasoning does not account for evidence in the record documenting the history of large-scale hydraulic fracturing operations, publicly available academic discussions of complex hydraulic fracturing operations dating back decades, and federal officials' own admissions. *See* DOI AR 0001188, 0002408, 0025662, 0027608, 0056272.

two reports by the National Academy of Sciences issued in 2011 and 2012 identifying "three *possible* mechanisms for fluid migration into shallow drinking-water aquifers that could help explain the increased methane concentrations observed in water wells that existed around shale gas wells in Pennsylvania." *Id*. at 16,194 (emphasis added). The reports indicated that of the three mechanisms, the first (movement of gas-rich solutions within the shale formations up into shallow drinking-water aquifers) was the "least likely possibility," and the third (migration of gases through new or enlarging of existing fractures above the shale formation) is "unlikely." *Id*. The second possible mechanism (contamination from leaky gas-well casings) is the "most likely." *Id*. From this, the BLM determined that "assurances of the strength of the casing are appropriate" but does not discuss how its existing regulations governing well casing are insufficient. *Id*. at 16,193.[19]

The BLM also cited "*potential* impacts" identified by the EPA in a 2014 report, which itself admitted the national study being undertaken at the time "to understand the potential impacts of hydraulic fracturing on drinking water resources" would enhance its scientific knowledge.[20] *Id*. at 16,194. Also within that report, the EPA noted a core

---

[19] In the opinion of a BLM Senior Petroleum Engineer in the Vernal, Utah Field Office, with 28 years experience working with oil and gas in both geology and engineering, the Fracking Rule will provide "no incremental protection to [underground sources of drinking water] or useable water zones over [BLM's] present regulations and policies." DOI AR 0026853.

[20] The EPA released its draft assessment of the potential impacts to drinking water resources from fracking in June 2015. U.S. Environmental Protection Agency, *Assessment of the Potential Impacts of Hydraulic Fracturing for Oil and Gas on Drinking Water Resources,* http://www2.epa.gov/hfstudy. The "major findings" of the study, as stated in the Executive Summary, are as follows:

> We did not find evidence that these mechanisms have led to widespread, systemic impacts on drinking water resources in the United States. Of the potential mechanisms identified in this report, we found specific instances where one or more mechanisms led to impacts on drinking water resources, including contamination of drinking water wells. The number of identified cases, however, was small compared to the number of hydraulically fractured wells.

element of the SDWA's UIC program is setting requirements for proper well siting, construction, and operation to minimize risks to underground sources of drinking water and pointed to its own UIC permitting guidance specific to oil and gas hydraulic fracturing activities using diesel fuels. "Thus, states and tribes responsible for issuing permits and/or updating regulations for hydraulic fracturing will find the recommendations useful in improving the protection of underground sources of drinking water and public health wherever hydraulic fracturing occurs." U.S. Environmental Protection Agency, *Natural Gas Extraction – Hydraulic Fracturing: Providing Regulatory Clarity and Protections against Known Risks*, http://www2.epa.gov/hydraulicfracturing#providing.

The final rule's preamble briefly discusses prevention of "frack hits," "which are unplanned surges of pressurized fluids from one [oil and gas] wellbore into another [oil and gas] wellbore." 80 Fed. Reg. at 16,193. "During these instances of downhole inter-well communication, . . . the pumped-in hydraulic fracturing fluid *may* flow into and up through a nearby well, causing a blow out and spill." *Id.* at 16,194 (emphasis added). Although frack hits have resulted in surface spills and caused the loss of recoverable oil and gas, "they have not yet been shown to be a source of contamination of usable water." *Id.* at 16,193. So, while frack hits may very well be a concern the BLM should address, they do not appear to be a valid justification for the Fracking Rule, particularly where they were not even raised as an issue in the supplemental rule. *See* 78 Fed. Reg. 31,636; 80 Fed. Reg. 16,149; DOI AR 0080262. Finally, the BLM also references public concern

---

*Id.*, Executive Summary at 6.

about "whether the chemicals used in fracturing pose risks to human health, and whether there is adequate management of well integrity and the fluids that return to the surface during and after fracturing operations." 80 Fed. Reg. 16,128.

The BLM does not appear to have given any consideration to whether these concerns or potential impacts are substantiated by fact or to the evidence contrary to its conclusion that there is a need for "additional regulatory effort and oversight." *Id.* at 16,128. "In determining whether [an agency's] decision is supported by substantial evidence, the court must also consider that evidence which fairly detracts from the [agency's] decision." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007). The record reflects that both experts and government regulators have repeatedly acknowledged a lack of evidence linking the hydraulic fracturing process to groundwater contamination.[21] The BLM fails to reference a single confirmed case of the hydraulic fracturing process contaminating groundwater. While the Court agrees the BLM need not wait for "a catastrophe" to take action for the protection of public resources from risks,[22] there must be substantial evidence to support the existence of a risk. The Court sees nothing in the BLM's official explanation (or the record) that satisfies the APA's arbitrary and capricious standards.

While recognizing that many states have regulations in place addressing hydraulic fracturing operations, the BLM determined that the state requirements are not uniform and do not necessarily fulfill BLM's statutory obligations, and further reasoned that

---

[21] *See* DOI AR 0008326, 0026855, 0027636, 0056216-22, 0056627-29, 0065277.
[22] *See Resp't Br. in Opp'n to Industry Pet'rs' Mot. for Prelim. Inj.* at 29.

26

"[t]he provisions in this final rule provide for the BLM's consistent oversight and establish a baseline for environmental protection across all public and Indian lands undergoing hydraulic fracturing." 80 Fed. Reg. at 16,130. *See also id.* at 16,133 and 16,154. While the record contains some comparative analyses regarding how the state regulations differ from one another and from the Fracking Rule (*see* DOI AR 0004772, 0007893-94, 0045522-27, 0100575-80), there is no discussion of how any existing state regulations are inadequate to protect against the perceived risks to groundwater. The BLM fails to identify any states that do not have regulations adequate to achieve the objectives of the Fracking Rule, nor does the BLM cite evidence that its rule will be any more effective in practice than existing state regulations protecting water and other environmental values. Indeed, the record supports the contrary.[23] The Court finds a desire for uniformity, in itself, is insufficient.[24] Because the BLM has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts and the choice made," the Fracking Rule is likely arbitrary, requiring that it be set aside. *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1220-21 (10th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43) (internal quotation marks omitted).

---

[23] *See* DOI AR 0055854 (letter from Wyoming Congressional delegation referencing Secretary of the Interior Sally Jewell's June 2013 testimony before the Senate Energy and Natural Resources Committee that she could not identify any state currently regulating hydraulic fracturing which was not doing a sufficient job); DOI AR 0001723, 0007036, 0009170, 0014055, 0026852, 0027636, 0052532-33, 0094637.

[24] *See* DOI AR 0045527 (*The State of State Shale Gas Regulation – Executive Summary*, May 2013) ("Heterogeneity alone is not a bad thing, and is not necessarily surprising. But whether it is justified – in an economic and environmental sense – depends on whether it is rooted in underlying differences among states that affect the costs and benefits of policy choices (for example, differences in hydrology, geology, and demographics).").

The Industry Petitioners further challenge particular aspects of the Fracking Rule as being arbitrary and capricious. Given the Court's preliminary findings above, which are dispositive on the validity of the final rule as a whole, the Court need not address each of the specific issues raised by Petitioners. Nevertheless, the Court will briefly address those issues it finds most problematic.

### a. Mechanical Integrity Testing

The final rule requires that before hydraulic fracturing operations begin, the operator must perform a successful mechanical integrity test ("MIT") of any casing or fracturing string through which the operation will be conducted. *See* 43 C.F.R. § 3162.3-3(f). BLM's Onshore Oil and Gas Order No. 2 already requires operators to conduct casing integrity tests to ensure that all casing can withstand the pressures to which the wellbore will be subject. *See Onshore Oil and Gas Order No. 2, Drilling Operations* § III.B.1.h & i, 53 Fed. Reg. 46,798-01, at 46,809 (Nov. 18. 1988). "The MIT required by final section 3162.3-3(f) is not equivalent to either the casing pressure test required by Onshore Order 2, section III.B.1.h., or the casing shoe pressure test as currently required by Onshore Order 2, section III.B.1.i." 80 Fed. Reg. at 16,160. Aside from brief reference to consistency with industry guidance and many state regulations (without citation), the BLM offers no explanation for modifying the pressure test requirement.

Additionally, the Fracking Rule's new MIT requirement applies not only to vertical casing that is designed to protect usable water, but also to horizontal laterals. This requirement was a change from the supplemental proposed rule which required an MIT on only vertical sections of the wellbore. *See* 80 Fed. Reg. at 16,159. The BLM

28

briefly explains that the purpose of this change is to ensure "that the entire length of casing or fracturing string, not just the vertical section, prior to the perforations or open-hole section of the well, is able to withstand the applied pressure and contain the hydraulic fracturing fluids." *Id*. There is no further discussion or explanation of the reason(s) why this additional testing of the lateral is important. This is particularly troubling since this change was made in the final rule without opportunity for the public to comment on the viability or costs of such a requirement.[25] It does not appear that any comments were submitted addressing the initial requirement to only perform an MIT on vertical sections of the wellbore. *See id*. at 16,159-161.

"An agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed and not casually ignored, and if an agency glosses over or swerves from prior precedent without discussion it may cross the line from the tolerably terse to the intolerably mute." *Grace Petroleum Corp. v. F.E.R.C.*, 815 F.2d 589, 591 (10th Cir. 1987) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). And, while an agency is permitted to make changes in the proposed rule after the comment period without a new round of commentary, the changes must be "in character with the original scheme and be foreshadowed in proposals and comments advanced during the rulemaking." *Beirne v. Sec'y of Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir. 1981) (internal quotation and citation omitted). The record does not reflect the BLM fulfilled these principles.

---

[25] Although testing the lateral wellbore is an admittedly new requirement, and the Fracking Rule's MIT test is "not equivalent" to current casing pressure test requirements, the BLM inexplicably assigns no incremental costs to this requirement, suggesting only that industry guidance and state regulations already require such testing. 80 Fed. Reg. at 16,198.

b. "Usable Water" Definition

A core provision of the Fracking Rule is the identification and isolation of "usable water." Since 1982, operators have been required to "isolate freshwater-bearing [formations] and other usable water containing 5,000 ppm ["parts per million"] or less of dissolved solids . . . and protect them from contamination."[26] 43 C.F.R. § 3162.5-2(d). Under the 1982 rule, "fresh water" is defined to mean "water containing not more than 1,000 ppm of total dissolved solids ["TDS"]" or other toxic constituents. *Id.* § 3160.0-5. The 1,000 ppm standard for "fresh water" is double the secondary maximum contaminant level the EPA has designated for TDS in drinking water (500 ppm). *See* DOI AR 0056230. The Industry Petitioners' comments on the proposed rule noted that a TDS concentration of 2,000 ppm is the highest recommended for irrigation and livestock consumption and cited authorities emphasizing that water with 10,000 ppm or more may cause brain damage or death in livestock. *See* DOI AR 0056230-31.

Gone from the Fracking Rule is any reference to fresh water. The final rule amends § 3162.5-2(d), revising the first sentence of the subsection to require the operator to "isolate all usable water and other mineral-bearing formations and protect them from contamination." The final rule defines "usable water" as "[g]enerally those waters containing up to 10,000 parts per million (ppm) of total dissolved solids." 43 C.F.R. § 3160.0-5. The BLM states the reason for this modification to the previous rule is to remove the inconsistency between the requirement in the CFR and the requirement in Onshore Order No. 2. 80 Fed. Reg. at 16,141. The BLM claims "[t]he requirement to

---

[26] *See also* DOI AR 0005111, 0005309.

protect and/or isolate usable water generally containing up to 10,000 ppm of TDS has been in effect since 1988, when Onshore Order 2 became effective."[27]  *Id.*

Onshore Order No. 2 explains, "The standard for 'usable water' of 10,000 ppm of total dissolved solids is based on the regulatory definition by the Environmental Protection Agency of 'drinking water' at 40 CFR 144.3." 53 Fed. Reg. 46,798. The EPA's definition is a rule implementing the UIC program under the SDWA. Yet, the definition of "usable water" in BLM's final rule encompasses even more zones of water than the EPA's definition of "underground source of drinking water" in § 144.3. The EPA's definition of an "underground source of drinking water" contains criteria beyond a simple numerical TDS content upon which the Fracking Rule relies. The EPA defines "underground source of drinking water" as a non-exempt aquifer (or a portion of an aquifer) that supplies a public water system or that contains a sufficient quantity of ground water to supply a public water system and either currently supplies drinking water for human consumption or contains fewer than 10,000 mg/l TDS. *See* 40 C.F.R. § 144.3. The BLM provides no reasoned basis or factual support for its broader definition of usable water; instead, the BLM simply speculates that other aquifers "might be usable for agricultural or industrial purposes, or to support ecosystems" now or in the future. 80 Fed. Reg. at 16,143.

The BLM further disregards its existing *practice* with respect to implementation of the purported 10,000 ppm standard, insisting that this provision will not be an increased burden on operators because it simply incorporates the existing *requirements* in Onshore

---

[27] *But see* DOI AR 0021777, 0022886, 0027276, 0027483; DOI PS 0179035, 0301573.

Order Nos. 1 and 2. *Id*. at 16,142, 16,151. Under the Fracking Rule, operators are assigned an affirmative obligation to identify the location of usable water to be protected based on the quantitative TDS calculation. *See* 43 C.F.R. § 3162.3-3(d)(1)(iii) (requiring request for approval of hydraulic fracturing to include identification of the "estimated depths (measured and true vertical) to the top and bottom of all occurrences of usable water"). The record reflects this is a new burden. Under current practice, state oil and gas agencies and BLM field offices inform operators about the location of usable water that must be protected, taking into account local geology, and direct the depths at which it is acceptable to set well casing.[28] And while the BLM agrees "that in many instances state or tribal oil and gas regulators, or water regulators, will be able to identify for operators some or all of the usable water zones that will need to be isolated and protected," 80 Fed. Reg. at 16,151, the agency has not explained how information received from States and field offices will assist operators to identify usable water of which even the regulators are unaware. Nor has the BLM identified the "substantial evidence" supporting its apparent determination that compliance with the new rule is both feasible and free of further cost.[29]

The BLM ignored extensive comments in the record emphasizing the difficulty and expense of measuring the numerical quality of water with the precision the final rule

---

[28] *See* DOI AR 0027169, 0056234, 0056687; DOI PS 0393425, 0435828. The Government's responsive memorandum does not contain any discussion challenging the assertion that this is the existing practice.

[29] Relying solely on its position that the definition of usable water has not changed, the BLM concluded "there will be no significant changes in costs of running casing and cement." 80 Fed. Reg. at 16,142. This conclusion ignores the comments in the record estimating the costs of obtaining more precise TDS data and the additional costs of casing and cementing associated with isolating formations that meet the numerical definition of usable water under the final rule, but which are located at depths deeper than the zones that state agencies and BLM field offices have previously designated as requiring isolation. *See* record citations in footnote 30; *see also* DOI AR 0056237, 0056638, 0056687.

requires.[30]  By failing to acknowledge the existing practice, the BLM further disregards any impact of the final rule on operators that drilled and cased existing wells relying on government instruction about casing depths.  The Fracking Rule regulates all future hydraulic fracturing in both new and existing wells.  *See* 43 C.F.R. § 3162.3-3(a).  There is no evidence in the record that the BLM, under current practice, ever required an operator to add an additional string of casing to protect "usable water" as defined by Onshore Order No. 2.  "[A]gencies may not impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy."  *Grace Petroleum Corp.*, 815 F.2d at 591 n.4 (quoting *Cities of Anaheim, Riverside, Banning, Colton and Azusa v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984)).

To be sustained, an agency's decision must be reasoned and based on consideration of relevant factors and important aspects of the problem.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Whereas operators could previously rely on the guidance of state and federal regulators in setting their casing, now the burden of identification and risk of missing information shifts to the operators.  The BLM's preamble fails to explain the reasons for this new approach, the costs and benefits of the new approach, or the evidence of harm (if any) incurred under the former approach.  "If Congress established a presumption from which judicial review should start, that presumption . . . is . . . *against* changes in current policy that are not justified by the rulemaking record."  *Id.* at 42 (emphasis in original).

c.  Pre-Operation Disclosures

---

[30] *See* DOI AR 0056164, 0056234, 0056638, 0056877; DOI PS 0301574, 0435731.

The Fracking Rule represents a significant expansion of the information that oil and gas developers are required to disclose publicly both before and after operations. *See* 80 Fed. Reg. 16,128 ("Key changes to the final rule include . . . more stringent requirements related to claims of trade secrets exempt from disclosure . . . [and] additional disclosure and public availability of information about each hydraulic fracturing operation[.]"). Before commencing hydraulic fracturing operations, producers will be required to disclose operational information about the location where drilling will take place, water resources in the vicinity of operations, the location of other wells or natural fractures or fissures in the area, and the producer's fracturing plans (including the amount of fluid to be injected, the pressure to be applied to the formation, and the estimated length, height, and total vertical depth of the fractures). *See* 43 C.F.R. § 3162.3-3(d)(1)-(7). After hydraulic fracturing operations, operators will be required to disclose detailed operational information including the components of fracturing fluid used in stimulation, the pressures applied to geologic formations, the length, height, and direction of fractures, and the actual depth of perforations. *Id*. § 3162.3-3(i).

Recognizing the proprietary nature of some of this information, particularly regarding local geology and the operators' technical plans and designs, the BLM has provided a mechanism for operators to protect the information that is required to be submitted in the completion reports submitted *after* hydraulic fracturing. *Id*. § 3162.3-3(j). However, the BLM fails to provide any regulatory protection for similar information required to be submitted *before* hydraulic fracturing. In the preamble, the BLM suggests that when submitting information to the agency, an operator "may

segregate the information it believes is a trade secret, and explain and justify its request that the information be withheld from the public." 80 Fed. Reg. at 16,173. The language of the Fracking Rule itself is more limited. The specific provision allowing operators to withhold information from disclosure, 43 C.F.R. § 3162.3-3(j), applies only to the information required to be submitted under paragraph (i) of Section 3162.3-3. *Id.* § 3162.3-3(j)(1). Paragraph (i) is the provision that identifies the information that must be provided *after* hydraulic fracturing is completed. There is no analogous provision in the final rule allowing operators to protect information that the rule requires to be submitted *before* hydraulic fracturing operations.

The BLM provides no explanation in the record for drawing a distinction between pre- and post-hydraulic fracturing information. The BLM acknowledges receiving comments that information required in the pre-hydraulic fracturing reports represents confidential information. 80 Fed. Reg. at 16,154. Indeed, in its responsive brief, the BLM claims "[b]oth pre- and post-operation submissions share the same level of protection from disclosures." (*Resp't Br. in Opp'n to Industry Pet'rs' Mot. for Prelim. Inj.* at 31.) Yet, in response to the public comments, the BLM states its opinion that "the submission of these estimated values would not routinely meet any of the criteria within the Freedom of Information Act regulations (43 CFR part 2) which would require such information to be held as confidential information." 80 Fed. Reg. at 16,154. The BLM provides no explanation of the reasoning it employed to reach this conclusion or the bases for its belief. "The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious." *Bracco Diagnostics, Inc. v. Shalala,*

35

963 F. Supp. 20, 28 (D.D.C. 1997) (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996)).

      3.     <u>Whether the BLM Adequately Consulted with Indian Tribes</u>

The Court also finds merit in the Ute Indian Tribe's argument that the BLM failed to consult with the Tribe on a government-to-government basis in accordance with its own policies and procedures. On December 1, 2011, pursuant to authority under 25 U.S.C. §§ 2 and 9, the Secretary of the Interior issued Order No. 3317 setting forth the Department of the Interior ("DOI") Policy on Consultation with Indian Tribes.[31] Order No. 3317 stated the following updated and expanded DOI policy on consultation with Indian tribes:

> a.     Government-to-government consultation between appropriate Tribal officials and the Department requires Department officials to demonstrate a *meaningful commitment* to consultation by identifying and involving Tribal representatives in a meaningful way *early in the planning process*.

> b.     Consultation is a process that aims to create *effective collaboration* with Indian tribes and to *inform Federal decision-makers*. Consultation is built upon government-to-government exchange of information and promotes enhanced communication that *emphasizes trust, respect, and shared responsibility*. . . .

> c.     Bureaus and offices will seek to promote cooperation, participation, and efficiencies between agencies with overlapping jurisdictions, special expertise, or related responsibilities when a Departmental action with Tribal implications arises. Efficiencies derived

---

[31] Available at http://elips.doi.gov/elips/0/doc/3025/Page1.aspx. The Secretary's intent in issuing this updated and expanded policy was to acknowledge compliance with Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments), directing federal agencies to develop a consultation process "to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." (EO 13175, Sec. 5) (65 Fed. Reg. 67249) (Nov. 6, 2000). On November 5, 2009, President Obama issued a Presidential Memorandum directing each agency to submit a detailed plan of action describing how the agency will implement the policies and directives of EO 13175.

from the inclusion of Indian tribes in all stages of the tribal consultation will help ensure that future Federal action is achievable, comprehensive, long-lasting, and reflective of tribal input.

*Id.* Sec. 4 (emphasis added). The Secretary's Order directed DOI bureaus and offices to, within 180 days, review their existing practices and revise those practices in compliance with the updated policy. *Id*. Sec. 5(c). The DOI's Policy required each bureau or office to consult with Indian tribes "*as early as possible* when considering a Departmental Action with Tribal Implications." (*Dep't of the Interior Policy on Consultation with Indian Tribes* at ¶ VII.E.1) (emphasis added).[32]

Effective December 2, 2014, still prior to publication of the Fracking Rule, the DOI converted the provisions of Order No. 3317 to the DOI Departmental Manual. *See* Departmental Manual, Part 512, Chapters 4 and 5.[33] Chapter 4 reiterates the DOI policy to "consult with tribes on a government-to-government basis whenever DOI plans or actions have tribal implications." 512 DM 4.4. Chapter 5 sets forth the procedures and process that must be followed for consultation with Indian tribes. The consultation process should include the incorporation of tribal views in the decision-making process, respect for tribal sovereignty, and meaningful dialogue where the viewpoints of tribes and the DOI are shared, discussed, and analyzed. 512 DM 5.4. The appropriate DOI officials shall provide notice to, and begin consultation with, Indian tribes "as early as possible" during the initial planning stage. 512 DM 5.5(A)(1). The DOI's policies and

---

[32] Available at http://www.doi.gov/cobell/upload/FINAL-Departmental-tribal-consultation-policy.pdf.
"Departmental Action with Tribal Implications" is defined as "[a]ny Departmental regulation, rulemaking, policy, guidance, legislative proposal, grant funding formula changes, or operational activity that may have a substantial direct effect on an Indian Tribe . . . ." (*Dep't of the Interior Policy on Consultation with Indian Tribes* at ¶ III.)
[33] Available at http://elips.doi.gov/elips/browse.aspx.

procedures reflect the unique relationship between Indian tribes and the federal government and recognize Indian tribes' right to self-governance and tribal sovereignty.

The BLM contends it engaged in extensive tribal consultation when promulgating the Fracking Rule by holding four regional tribal consultation meetings ("information sessions") and distributing copies of a draft rule to affected tribes for comment in January 2012, and offering to meet individually with tribes after those regional meetings. 80 Fed. Reg. at 16,132; DOI AR 0023694. In June 2012, after publication of the proposed rule on May 11, 2012, and again after publication of the supplemental proposed rule in May of 2013, the BLM held additional regional consultation meetings and individual consultations with tribal representatives.[34] 80 Fed. Reg. at 16,132. *See also* DOI AR 0026578-81; DOI AR 0049740; DOI AR 0050425. In March 2014, the BLM invited tribes to another meeting in Lakewood, Colorado and offered to meet with individual tribes thereafter. 80 Fed. Reg. at 16,132. *See also* DOI AR 0075037-41 (3/18/2014 "Tribal Hydraulic Fracturing Outreach") (Ute Indian Tribe representative expressed opinion that "BLM has not been consulting with the Tribes in good faith").

The BLM's efforts, however, reflect little more than that offered to the public in general. The DOI policies and procedures require extra, *meaningful* efforts to involve tribes in the decision-making process. The record reflects the BLM spent more than a

---

[34] Although uniformly characterized by the Government as "consultations," many of these meetings appear to have been more intended as informational and outreach sessions, with more emphasis on "discussion" and less emphasis on "concerns." *See, e.g.,* DOI AR 0034423 at 34431 (transcript of 6/5/2102 "Tribal Consultation Meeting"). Following the initial round of regional information sessions, on May 14, 2012, Tex "Red Tipped Arrow" Hall, Chairman for TAT – MHA Nation (North Dakota), sent a letter to the Secretary of the Interior expressing his opinion that the BLM had not complied with its tribal consultation policies, particularly concerned that: the first regional tribal meetings were held only *after* the regulations had been developed and the draft rule prepared; and individual consultations would be with BLM field offices rather than "appropriate BLM officials." DOI AR 0020690-92.

year developing the proposed rule before initiating any consultation with Indian tribes. *See* 77 Fed. Reg. at 27,693 (describing public forums held in November, 2010, and April, 2011). The BLM had already drafted a proposed rule by the time the agency initiated consultation with Indian tribes in January of 2012. *See id.* Although the BLM asserts comments from affected tribes were considered in developing the final rule, the preamble cites only two changes resulting from tribal consultations: a clarification that tribal and state variances are separate from variances for a specific operator, and a requirement that operators certify to the BLM that operations on Indian lands comply with applicable tribal laws. 80 Fed. Reg. at 16,132. Several tribal organizations attempted to assert their sovereignty by encouraging an "opt out" provision for Indian tribes or allowing the tribes to exercise regulatory authority over hydraulic fracturing. *Id.* However, despite acknowledging "the importance of tribal sovereignty and self-determination," the BLM summarily dismissed these legitimate tribal concerns, simply citing its consistency in applying uniform regulations governing mineral resource development on Indian and federal lands and disavowing any authority to delegate regulatory responsibilities to the tribes. *Id.* This failure to comply with departmental policies and procedures is arbitrary and capricious action. *See Hymas v. United States*, 117 Fed. Cl. 466, 502-04 (2014); *Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 901 F. Supp. 996, 1003 (M.D.N.C. 1995).

**B.    *Irreparable Harm***

The irreparable harm factor requires a party "seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). To satisfy the irreparable harm requirement, a movant must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). A court must further assess "whether such harm is likely to occur before the district court rules on the merits." *Id.* (quoting *Greater Yellowstone Coal.*, 321 F.3d at 1260).

The States and Ute Tribe Petitioners assert irreparable harm based on the Fracking Rule's infringement on their sovereign authority and interests in administering their own regulatory programs governing hydraulic fracturing. Through the EPAct's amendment to the SDWA, Congress clearly expressed its intent that non-diesel hydraulic fracturing be removed from the realm of federal regulation, thereby lodging authority to regulate that activity within the States and Tribes. Thus, many states, including Petitioners Wyoming, Colorado, Utah and North Dakota, have existing regulations in place addressing hydraulic fracturing operations.[35]

The Fracking Rule creates an overlapping federal regime, in the absence of Congressional authority to do so, which interferes with the States' sovereign interests in, and public policies related to, regulation of hydraulic fracturing. Because the Fracking Rule places the States' and Tribe's "sovereign interests and public policies at stake," the harm these Petitioners stand to suffer is "irreparable if deprived of those interests without

---

[35] Other states with regulations in place addressing hydraulic fracturing include Alaska, Arkansas, Illinois, Michigan, New Mexico, Ohio, Oklahoma, Pennsylvania, Texas, California, Montana, and Nevada. *See* 80 Fed. Reg. at 16,130 & 16,187; DOI PS 0000910.

first having a full and fair opportunity to be heard on the merits." *Kansas v. U.S.*, 249 F.3d 1213, 1227 (10th Cir. 2001). *See also Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1287 (D. Wyo. 2004) (National Park Service regulation adversely affecting State of Wyoming's ability to manage its trails program and fish populations was infringement on state sovereignty constituting irreparable harm); *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (invasion of tribal sovereignty can constitute irreparable injury). This harm would occur the moment the Fracking Rule goes into effect.

The States and Ute Tribe further contend irreparable harm through economic losses in the form of substantially decreased royalty and tax revenue. These Petitioners argue, and the record supports, that these losses will be caused by additional delay to permit oil and gas wells for development and/or operators opting to drill on lands not subject to federal regulation.[36] There can be no doubt that for these States, particularly like Wyoming which consists of an inordinate amount of federal land, and any Tribes, like the Ute Tribe, which rely on energy production as the primary source of funding for tribal governmental services, delay or avoidance of drilling operations on these federal and tribal lands would likely lead to substantial economic losses.[37] To the extent such losses would be permanent, they are irreparable because the States and Tribes cannot

---

[36] *See* DOI AR 0026856 (comment from BLM Sr. Petroleum Eng'r regarding additional delay); DOI AR 0055854 (letter to Secretary of Interior from Wyoming Congressional delegation citing March 2012 testimony of then BLM Director Bob Abbey that there has been "a shift [in oil and gas production] to private lands in the East and to the South where there are fewer amounts of Federal mineral estate"); DOI AR 0023298, 0048262, 0051036, 0053915, 0057066, 0066303, 0080222; DOI PS 0008961-62, 0010358, 0179200-01, 0301256-57.

[37] DOI AR 0021123-24, 0028351-52, 0030226, 0051050, 0056291, 0057066, 0104456; DOI PS 0000910 (letter from Lincoln County, Nevada stating more than 98% of county in federal management); DOI PS 0009100 (80% of Park County, Wyoming is federal land with more than half of its assessed valuation coming from oil and gas development); DOI PS 0010267, 0010570-71.

recover money damages from the federal government. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (explaining that while economic loss is usually insufficient to constitute irreparable harm, "imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury").

The Industry Petitioners contend the Fracking Rule subjects their members to at least two distinct and certain risks of irreparable harm: (i) compliance costs and (ii) disclosure of trade secrets and confidential information. The BLM estimates that operational costs attributable to complying with the rule's requirements will be about $32 million per year, equating to approximately $11,400 per well. 80 Fed. Reg. at 16,130. Evidence in the record suggests the BLM has significantly underestimated the compliance costs. Still, even accepting the BLM's estimates, the Fracking Rule will impose compliance costs that the Industry Petitioners' members cannot recover due to sovereign immunity. Economic damages in the form of compliance costs that cannot later be recovered for reasons such as sovereign immunity constitute irreparable injury. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756, 770-71 (10th Cir. 2010) (finding trade associations' members were likely to suffer irreparable harm from compliance costs related to Oklahoma law that might total more than $1,000 per business per year because such costs were unrecoverable due to sovereign immunity).

The Industry Petitioners also contend the Fracking Rule will require their members to disclose trade secrets and confidential commercial information that cannot be compensated with money damages. *See* Naatz Aff. ¶ 7, Sgamma Aff. ¶ 6 (ECF Nos. 11-1

and 11-2 in 15-CV-041). As discussed above, the Fracking Rule represents a significant expansion of the information that oil and gas developers are required to disclose publicly both before and after operations. *See* 80 Fed. Reg. 16,128 (final rule includes "more stringent requirements related to claims of trade secrets exempt from disclosure" and "additional disclosure and public availability of information about each hydraulic fracturing operation"). The final rule will require operators to disclose proprietary hydraulic fracturing operational and design information, which BLM intends to disclose, at least in large part, to the public.[38] This is particularly concerning with respect to pre-operation disclosures which, as discussed above, are not expressly protected by the regulatory text of the rule. "A trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984). *See also Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, Circuit Justice) (refusing to grant a stay of district court's injunction because the disclosure of Monsanto's trade secrets to other companies and the public would cause Monsanto irreparable harm); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3rd Cir. 1992) (threat of trade secret disclosure may establish immediate irreparable harm).

The BLM argues any such economic damages are not likely to occur during the pendency of this litigation. First, the BLM asserts a lack of evidence that any of the Industry Petitioners' members intend to engage in hydraulic fracturing before this Court rules on the merits. However, Petitioners' members include companies with oil and

---

[38] While some state regulations, like Wyoming's, also require submission of proprietary information related to fracking plans before and after fracking operations, the state regulations also have confidentiality provisions in place to protect such information. *See* Kropatsch Aff. ¶¶ 10, 12 (ECF No. 32-2); DOI AR 0027878.

natural gas leases on federal and Indian lands (Hr'g Tr. at 100); all federal and Indian lands are subject to the Fracking Rule; and contemporary oil and gas development invariably involves hydraulic fracturing (*see* 80 Fed. Reg. at 16,131) (estimating that ninety percent of wells drilled on federal lands in 2013 were stimulated using hydraulic fracturing techniques). Some of Petitioners' members plan to complete wells using hydraulic fracturing in the coming months, likely before this action is resolved on the merits. (*See* Hr'g Tr. at 100, 102-104; Bayless Decl. ¶ 5; Barnes Decl. ¶ 5; Decker Decl. ¶ 5.)

Second, the BLM asserts Petitioners' members will not incur any compliance costs "unless they voluntarily elect to engage in hydraulic fracturing on federal or Indian land before this litigation is over." (*Resp't Br. in Opp'n to Industry Pet'rs' Mot. for Prelim. Inj.* at 51.) The BLM's assertion, however, disregards other costs associated with developing oil and gas assets. The Fracking Rule, which included changes from the supplemental proposed rule, was published on March 26, 2015 and was scheduled to become effective on June 24, 2015 – a period of ninety days. As the BLM recognizes, hydraulic fracturing is only one step in the oil and gas development process and that process often involves coordination with a wide range of contractors and service providers on a schedule that commits money and resources much further out than ninety days. (*See Resp't Br. in Opp'n to Industry Pet'rs' Mot. for Prelim. Inj.* at 54) (noting "BLM's observation that most contracts with hydraulic fracturing service providers are signed about six months prior to the date of fracking"). Once contractually committed, operators cannot simply choose not to conduct hydraulic fracturing without incurring

liability for material and services for which the operator has already contracted. (*See* Bayless Decl. ¶ 6; Barnes Decl. ¶ 6.)

The BLM also suggests the "phase-in" period allows operators to avoid any additional costs or burdens for the first ninety days after implementation of the rule. However, a ruling on the merits is not likely to issue within ninety days. Moreover, the 90-day implementation period simply exempts an operator from complying with the preapproval (paperwork) requirements for ninety days "if . . . an APD was submitted but not approved as of June 24, 2015 [or] an APD or APD extension was approved before June 24, 2015, but the authorized drilling operations did not begin until after June 24, 2015." 43 C.F.R. § 3162.3-3(a). All other requirements of the rule (cementing, casing, monitoring, etc.) apply upon its effective date and, in all other circumstances, an operator must comply with *all paragraphs* of the Fracking Rule. *Id.*

Finally, regarding disclosure of trade secrets and confidential information, the BLM argues Petitioners have not shown the BLM is likely to disclose any proprietary information that should be protected from public disclosure. The BLM cites to "FOIA or other applicable public records law" and regulations outside of the Fracking Rule that supposedly protect the confidentiality of such information, including information that must be submitted prior to commencing fracturing operations. *See, e.g.,* 43 C.F.R. §§ 2.26-2.36. However, the BLM has expressed its unsupported belief that operational information submitted as part of the application for approval to conduct hydraulic fracturing "would not routinely meet any of the criteria within the Freedom of Information Act regulations (43 CFR part 2) which would require such information to be

held as confidential information." 80 Fed. Reg. at 16,154. Thus, it appears the BLM has already determined such information is subject to public disclosure.

The Court finds the State and Ute Tribe Petitioners and the Industry Petitioners have demonstrated the likelihood of irreparable injury in the absence of a preliminary injunction.

## C. Balance of Equities and Public Interest

The third preliminary injunction factor requires the Court to determine whether the threatened injury to the movants outweighs the injury to the opposing party under the injunction. *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 889 (10th Cir. 2013). When the government is the opposing party, it is appropriate for the Court to consider jointly the balance of harms and public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (assessing the harm to the opposing party and weighing the public interest merge when the government is the opposing party). It is uncontested that the public has an important interest in safe and environmentally responsible oil and gas development on public lands. But there can also be little dispute that, particularly for the western public lands states and Indian Tribes, the stakes of federal oil and gas regulation are high and the public has an important interest in the proceeds derived from oil and gas development on public and tribal lands.

Whereas Petitioners have demonstrated that a preliminary injunction is necessary to avoid irreparable harm, the issuance of an injunction poses little more than an inconvenience to the BLM's interests. First, neither the BLM nor Respondent-Intervenors can demonstrate that any environmental harm will likely result if the effective

46

date of the Fracking Rule is delayed.[39] The BLM has not identified a single groundwater contamination incident that the Fracking Rule would have prevented, nor offered any analysis measuring, even in estimate form, the risk of environmental harm that the rule purports to prevent. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987) (finding the balance of harms tipped in industry's favor when industry had incurred economic costs and movants had failed to show a sufficient likelihood of environmental injury).

To the contrary, the United States Environmental Protection Agency ("EPA") recently released a draft "state-of-the-science assessment" of the available scientific literature and data on the effects of hydraulic fracturing on drinking water resources. U.S. Envtl. Prot. Agency, *Assessment of the Potential Impacts of Hydraulic Fracturing for Oil and Gas on Drinking Water Resources* at Draft ES-1, ES-24 (June 2015).[40] The EPA observed that between 2011 and 2014, as many as 120,000 wells were completed with hydraulic fracturing. *Id*. at ES-5 (estimating 25,000-30,000 new wells were drilled and hydraulically fractured annually in the United States during that time). The EPA also reported that "[a]pproximately 6,800 sources of drinking water for public water systems were located within one mile of at least one hydraulically fractured well during the same period." *Id*. at ES-6. Yet, the EPA identified only three suspected incidents "that have or may have" resulted in impacts to drinking water resources. *Id*. at ES-14 to 15. While the

---

[39] DOI AR 0026855, 0044000, 0056611, 0082444, 0097398 ("No Spills or incident reports [] in [BLM] record/database indicates contamination of groundwater due to leaks or spills from [hydraulic fracturing] operation."), 0097956 (BLM has "no records of any hydraulic fracturing operation that has contaminated the usable groundwater zones with hydraulic fracturing fluids").

[40] Available at: http://www2.epa.gov/sites/production/files/2015-06/documents/hf_es_erd_jun2015.pdf.

EPA noted there are "mechanisms" by which fracking activities have the *potential* to impact groundwater, the agency "did not find evidence that these mechanisms have led to widespread, systemic impacts on drinking water resources in the United States." *Id.* at ES-6. To the extent there are any potential risks of harm, nearly all hydraulic fracturing operations are already subject to existing state regulations protecting groundwater resources.[41] *See* 80 Fed. Reg. at 16,178 (observing that "[a]ll state laws apply on Federal lands"); *id.* at 16,187 (referencing regulations in California, Colorado, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming and acknowledging that more than ninety-nine percent of total well completions on federal lands since 2010 were located in one of these states).

The BLM argues the public will be harmed by a disruption of the ongoing implementation of the final rule, including internal agency efforts as well as ongoing coordination with states and tribal authorities. The Court is not persuaded that delayed administrative agency efforts, without more, constitute harm – even so, such harm does not outweigh the likely harm to Petitioners in the absence of an injunction. *See Texas v. U.S.*, 787 F.3d 733, 768 (5th Cir. 2015) ("government's allegation that the injunction is delaying preparatory work is unpersuasive [because] [i]njunctions often cause delays, and the government can resume work if it prevails on the merits"). Moreover, the fact that the BLM has expended substantial time and resources to implement the new regulatory scheme bears no relationship to the harm the BLM would allegedly suffer from a *delay* of

---

[41] *See* DOI AR 0043104, 0094637; DOI AR 0055854 (letter from Wyoming Congressional delegation referencing Secretary of the Interior Sally Jewell's June 2013 testimony before the Senate Energy and Natural Resources Committee that she could not identify any state currently regulating hydraulic fracturing which was not doing a sufficient job).

that implementation during the pendency of litigation. *See Comanche Nation, Okla. v. U.S.*, 393 F. Supp. 2d 1196, 1211 (W.D. Okla. 2005) (finding balance of harm weighed in favor of movant tribe because United States would bear no additional financial or regulatory burden from any delay of the proposed action but tribe would suffer loss of self-governance). If the BLM ultimately prevails, the agency may resume its efforts to implement the Fracking Rule.

The BLM further asserts a presumption of harm when an agency is prevented "from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *N. Arapaho Tribe v. Burwell*, --- F. Supp. 3d ---, No. 14-CV-247-SWS, 2015 WL 872190, at *16 (D. Wyo. Feb. 26, 2015). Such an argument begs the question. In this instance, Congress did not direct the BLM to regulate hydraulic fracturing; rather, this Court has found that the BLM likely *lacks* Congressional authority to promulgate the Fracking Rule. When Congress passed the EPAct of 2005, it determined that the public interest was best served by removing federal regulation of hydraulic fracturing with one exception. *See* 42 U.S.C. § 300h(d)(1)(B) (leaving the regulation of hydraulic fracturing using diesel fuels within the purview of the EPA). In sum, any harm to the BLM's or Intervenors' interests is outweighed by the harm to Petitioners.

The issuance of an injunction would also serve the public interest by maintaining the status quo[42] and avoiding the implementation of agency action which was likely

---

[42] Evidence presented at the preliminary injunction hearing suggested the BLM is presently unprepared to administer the new regulations or meet the additional administrative responsibilities and burdens on the agency. *See also* DOI

promulgated in excess of statutory authority.[43] A preliminary injunction would also avoid regulatory uncertainty and confusion. Delaying implementation of the Fracking Rule will cause the BLM "no appreciable harm" and allowing "a full and final resolution on the merits is in the best interests of the public."[44] Moreover, the generation of revenue and employment from mineral development projects serves the public interest.[45] Duplicative regulation that frustrates or delays development and incentivizes operators to move development activity off of federal lands negatively impacts states and tribes which rely heavily on these revenues to fund public projects and services.[46] Certainly this interest must be balanced against the public interest in protecting the environment.[47] Here, however, where there is no showing of harm to the environment, the public interest factor weighs in favor of Petitioners. *See Nat'l Indian Youth Council v. Andrus*, 623 F.2d 694, 696 (10th Cir. 1980) (the public interest favored coal development where "the possibility of environmental damage is presently minimized").

## CONCLUSION

One of the fundamental questions presented in this case is whether Congress granted or delegated to the BLM the authority or jurisdiction[48] to regulate fracking –

---

AR 0026855-56, 0028392, 0034461, 0050215, 0068786, 0074849, 0078643, 0109773; DOI PS 0008720-21, 0010661, 0301278.

[43] *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (public interest served by enjoining the enforcement of invalid provisions of state law likely to be held unconstitutional).

[44] *See North Dakota v. EPA*, No. 3:15-CV-059, 2015 WL 5060744, at *8 (D.N.D. Aug. 27, 2015) (unpublished).

[45] *See* DOI AR 0050435-36, 0068786-87; DOI PS 0010898-907.

[46] *See* DOI AR 0007591, 0021123-24, 0028390-94, 0049740, 0075037-41; DOI PS 0008870-71, 0010476, 0010908-915, 0067101.

[47] *See* DOI AR 0056063-64, 0056108-09, 0056184; DOI PS 0063816.

[48] Chief Justice Roberts recently noted the confusion surrounding the term "jurisdiction" when used in the context of determining whether Congress has delegated to an agency authority to regulate a certain activity by enactment of rules and regulations with the force and effect of law. *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1880 (2013) (Roberts, C.J., dissenting).

despite having specifically removed such authority in the Energy Policy Act of 2005 from another federal agency (the EPA) under the SDWA. At this point, the Court does not believe Congress has granted or delegated to the BLM authority to regulate fracking.

Our system of government operates based upon the principle of limited and enumerated powers assigned to the three branches of government. In its simplest form, the legislative branch enacts laws, the executive branch enforces those laws, and the judicial branch ensures that the laws passed and enforced are Constitutional. *See Marbury v. Madison*, 5 U.S. 137, 176 (1803). A federal agency is a creature of statute and derives its existence, authority and powers from Congress. It has no constitutional or common law existence or authority outside that expressly conveyed to it by Congress. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Michigan v. EPA*, 268 F.3d 1075, 1081-82 (D.C. Cir. 2001). In the absence of a statute conferring authority, an administrative agency has none. *See American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119-20 (D.C. Cir. 1995). Mere ambiguity in a statute is not evidence of congressional delegation of authority. *See Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998). Neither can agency authority be lightly presumed. *Michigan v. EPA*, 268 F.3d at 1082. If the delegation of authority was presumed absent an express withholding of such authority, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Id.* (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)). *See also City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1886 (2013) (Roberts, C.J., dissenting).

Before the Court can defer to the BLM's methods of regulating fracking, this Court must conclude Congress has delegated that authority to it. It does not appear Congress has done so directly or inferentially. In fact, in a comprehensive legislative enactment addressing domestic energy development, including oil and natural gas, Congress expressly amended the SDWA to remove from the EPA the authority to regulate any non-diesel fracking on federal or state lands.[49] It is hard to analytically conclude or infer that having expressly removed the regulatory authority from the EPA, Congress intended to vest it in the BLM, particularly where the BLM had not previously been regulating the practice. *See Brown & Williamson,* 529 U.S. at 130-33 (in determining whether Congress had granted FDA jurisdiction or authority to regulate tobacco products, Court would look to other Acts to see if Congress had specifically spoken to topic at hand). Moreover, since the enactment of the Energy Policy Act of 2005, several bills have been unsuccessfully introduced in Congress to restore the EPA's regulatory authority under the SDWA over all hydraulic fracturing.[50] Given these

---

[49] Prior to passing the Energy Policy Act of 2005, Congress was certainly aware of and attune to the use of hydraulic fracturing in oil and natural gas development. *See* 151 CONG. REC. S5533-37 (daily ed. May 19, 2005). *See also* Hydraulic Fracturing Safety Act of 2005, S. 1080, 109th Cong. (2005); Hydraulic Fracturing Act, S. 1374, 107th Cong. (2001). In 1999, responding to concerns raised by Congress, the EPA undertook a study to understand the impacts of hydraulic fracturing of coalbed methane wells. *Id.* at S5535. *See Underground Injection Control (UIC) Program; Proposed Coal Bed Methane (CBM) Study Design,* 65 Fed. Reg. 45,774 (July 25, 2000) (announcement that EPA intends to conduct a study of the environmental risks associated with hydraulic fracturing); *Underground Injection Control (UIC) Program; Hydraulic Fracturing of Coalbed Methane (CBM) Wells Report—Notice,* 67 Fed. Reg. 55,249 (August 28, 2002) ("EPA has preliminarily found that the potential threats to public health posed by hydraulic fracturing of CBM wells appear to be small"); U.S. Envtl. Prot. Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs; Nat'l Study Final Report* (June 2004) ("The Agency has concluded that the injection of hydraulic fracturing fluids into CBM wells poses minimal threat to USDWs."). In its 2000 appropriations, Congress specifically proposed $175,000 for the EPA to study the impact of hydraulic fracturing in Alabama. *See* H.R. REP. NO. 106-379 (1999) (Conf. Rep. on H.R. 2684).

[50] *See* To repeal the exemption for hydraulic fracturing in the Safe Drinking Water Act, H.R. 7231, 110th Cong. (2008); Fracturing Responsibility and Awareness of Chemicals (FRAC) Act of 2009, H.R. 2766 and S. 1215, 111th Cong. (2009); Fracturing Responsibility and Awareness of Chemicals Act of 2011, H.R. 1084, 112th Cong. (2011);

circumstances and the ongoing congressional debate,[51] it cannot be concluded that because Congress has not expressly forbidden the BLM's regulation of hydraulic fracturing on federal lands, the agency may now assert it. *See Michigan v. EPA,* 268 F.3d at 1085. An administrative agency derives its existence and authority to regulate from Congressional authorization or delegation. Congress has not authorized or delegated to the BLM authority to regulate hydraulic fracturing and, under our constitutional structure, it is only through Congressional action that the BLM can acquire this authority. *See Bowen,* 488 U.S. at 208; *Michigan v. EPA,* 268 F.3d at 1081.

For the reasons discussed above, the Court finds all four factors warranting the issuance of a preliminary injunction weigh in favor of movants, and Petitioners' right to relief is clear and unequivocal. THEREFORE, it is hereby

**ORDERED** that the *Motion for Preliminary Injunction* of Petitioners Independent Petroleum Association of America and Western Energy Alliance (ECF No. 11 in 15-CV-041), *Wyoming and Colorado's Motion for Preliminary Injunction* (ECF No. 32), *North Dakota's Motion for Preliminary Injunction* (ECF No. 52), and the *Motion for Preliminary Injunction* filed by Ute Indian Tribe (ECF No. 89) are **GRANTED,** and the

---

FRAC Act, S. 587, 112th Cong. (2011); Climate Protection Act of 2013, S. 332, 113th Cong. § 301 (2013); Fracturing Responsibility and Awareness of Chemicals Act of 2013, H.R. 1921, 113th Cong. (2013); FRAC Act, S. 1135, 113th Cong. (2013); Safe Hydration is an American Right in Energy Development Act of 2013, H.R. 2983, 113th Cong. (2013).
[51] Congress continues to debate the policy issues regarding the practice and regulation of hydraulic fracturing. *See* Protecting States' Rights to Promote American Energy Security Act, S. 15, 114th Cong. (2015) (would prohibit federal regulation of fracking in any state that has existing regulations); Native American Energy Act, H.R. 538, 114th Cong. (2015) (would make any DOI rules regulating fracking inapplicable on Indian lands absent consent from Tribe); Protect Our Public Lands Act, H.R. 1902, 114th Cong. (2015) (would ban hydraulic fracturing on federal lands under any new or renewed lease).

BLM is preliminarily enjoined from enforcing the final rule related to hydraulic fracturing on federal and Indian lands, 80 Fed. Reg. 16,128 (Mar. 26, 2015);[52] it is further

**ORDERED** that Petitioners are not required to post a bond or security.[53]

DATED this _30ᵀʰ_ day of September, 2015.

Scott W. Skavdahl
United States District Judge

---

[52] This preliminary injunction shall apply nationwide. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998) ("when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed"); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007), *rev'd on other grounds*, 555 U.S. 488 (2009) (nationwide scope of injunction compelled by APA where agency action found to be unlawful).
[53] District courts have wide discretion in determining whether to require security under F.R.C.P. 65(c). *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). Having determined there is no likelihood of harm to Respondents, the Court finds an injunction bond is unnecessary. *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).